UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CR 323 CDP / DDN |
| | ) | |
| MELVIN JOHN SCHERRER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND RECOMMENDATION

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). A pretrial hearing was held on September 10, 2014.

Pending for disposition are the motions of defendant Melvin John Scherrer to suppress evidence (Doc. 137 oral), to suppress evidence obtained through a search of his residence (Doc. 457), to suppress his statements (Doc. 458), and to suppress evidence obtained from the attachment of a global positioning system device on his vehicle and from Title III wiretaps (Doc. 459). Also, the government has moved for a determination by the court of the admissibility or not of any arguably suppressible evidence. (Doc. 136.)

## I
## MOTION TO SUPPRESS STATEMENTS

Defendant Scherrer has moved to suppress his statements to law enforcement officers. (Doc. 458.) In response, counsel for the government states it will not introduce statements made by defendant in response to questions posed by law enforcement

officers. (Doc. 472.) At the pretrial hearing, no contrary information or evidence was presented to the court. Therefore, this motion ought to be denied as moot.

## II

## MOTION TO SUPPRESS EVIDENCE ACQUIRED BY ELECTRONIC MEANS

Defendant moves to suppress evidence obtained through a global positioning system (GPS) device attached to his vehicle and evidence derived from Title III wiretaps.

The government has advised that it intends to offer at trial evidence acquired from

(a)     the electronic interceptions of voice communications over telephone numbers 314-606-0669, 314-814-5461, 573-664-6441, and 573-705-8969;

(b)     the use of a global positioning system (GPS) tracking device it placed on defendant's 2003 white Dodge Ram; and

(c)     the execution of a search warrant on July 24, 2013 at defendant's residence, 6858 Cedar Lake Drive.

From the evidence adduced at the hearing, the court makes the following findings and conclusions of law:

## FACTS

### (a)

### Electronic interceptions of voice communications

1.      The investigation that led to the indictment in this case included orders for wiretaps on telephones.

### 314-606-0669 (TT#3)

2.      a.      On April 4, 2013, the United States Attorney for this district, pursuant to 18 U.S.C. § 2518,[1] filed an application for an order, in Case No. 4:13 MC

---

[1]Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520.

167, authorizing the interception of wire communications to and from a cellular telephone being used by Brent Bouren, Jerami Westenberger, Jerry Addison, Joshua Ezell, and others unknown ("target subjects") bearing telephone number 314-606-0669, referred to as Target Telephone (TT) #3. The application sought a wiretap order for the monitoring of the telephone conversations of Bouren and the others, named and unnamed, in the government's investigation of the subjects' drug trafficking and related offenses. More specifically, the application stated:

> In particular, these wire communications will concern the specifics of the above-described offenses, including (1) the nature, extent and methods of operation of the illegal drug-trafficking business of one or more of **the target subjects** and others unknown; (2) the identities and roles of principles, accomplices, aiders and abettors, coconspirators and participants in these persons' above-described illegal activities; (3) the distribution, concealment, and transfer of the contraband and money involved in those activities; (4) the existence and location of records pertaining to those activities; (5) the location and sources of resources used to finance those illegal activities; (6) the location and disposition of the proceeds from those activities; and (7) the location of items used in furtherance of those activities.

(Gov. Ex. A, Tab 1 at 3-4.) The application stated, in part, that normal investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or were too dangerous to employ. The application was approved by a Deputy Assistant Attorney General in the Criminal Division of the Office of the Attorney General of the United States. (Gov. Ex. A, Tab 1.)

      b.      In his sworn affidavit, filed April 4, 2013, submitted in support of the application, Drug Enforcement Administration Task Force Officer Jeff Milam described his extensive training and experience in investigating the illegal trafficking in narcotics, and he set forth his expert opinions about the manner in which large-scale drug traffickers operate. He described the general types of sources of his information. He identified and described the backgrounds of the subjects of the investigation. He stated

that a search of certain federal investigative surveillance indices indicated two prior wiretap applications and orders related to this investigation:

(1)     On December 19, 2012, this court authorized a wiretap for 314-218-0979 involving two persons not named as targets in the instant affidavit. Jerami Westenberger, had been named in the earlier wiretap, but he was not intercepted on the phone. Interceptions on that phone number have ended.

(2)     On March 7, 2013, this court authorized a wiretap for 314-223-5226, subscribed to by Jerami Westenberger.   At the time of the instant affidavit, the monitoring was ongoing.  Targets Westenberger and Bouren have been intercepted on this wiretap.

c.     His affidavit described confidential source information received about the drug trafficking activities of Westenberger.  Confidential Source #1 (CS#1) has identified Westenberger as a cocaine distributor and has conducted consensually recorded conversations with Westenberger.   For the reasons stated, TFO Milam considered CS#1 a reliable source.

d.     The affidavit stated the wiretap sought will enable the investigators to determine (a) how the Westenberger organization obtains and distributes controlled substances; (b) the identities and roles of the organization members; (c) when and where the target offenses were committed; (d) the administration of the drug distribution and the receipt of drug sale proceeds; (e) the nature, scope, places and methods of the organization's operation; and (f) where trafficking records are kept.

e.     He described facts uncovered by the investigation to date to demonstrate that probable cause existed for the issuance of the order.  The affidavit includes facts, occurring between September 2012 and March 20, 2013, described in Westenberger's conversations with CS#1, Westenberger's introduction of CS#1 to Bouren, toll records and information regarding a source of drugs which Westenberger discontinued (Guillermo Navarro), monitored phone calls, text messages from

Westenberger, purchases of cocaine from Westenberger by an undercover officer as late as March 17, 2013, physical surveillance of Bouren following a drug sale, physical surveillance of Westenberger's residence, and recorded conversations during drug transactions.

f.      The affidavit also described facts derived from the analysis of pen register information regarding TT#3.  Between November 12, 2012 and April 2, 2013, there were 796 contacts with TT#3, involving target subjects Jerami Westenberger, Jerry Addison, and Joshua Ezell.

g.      The affidavit described the investigators' need for the authorization of interception and monitoring of conversations over TT#3.  The affidavit stated that the following investigative techniques have been attempted and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

(A)    **Wiretaps.**  The investigators monitored conversations over Target Telephone #1 and Target Telephone #2.  Westenberger was not intercepted over TT#1 and conversations monitored over that telephone did not yield the identity of his source; they did, however, lead to identifying the source of supply for Guillermo Navarro.    The monitoring of conversations over TT#2 identified Bouren as Westenberger's cocaine source and the identification of Jerry Addison as one who participates in the drug distribution.  It did not, however, identify Bouren's source and methods of trafficking, nor the people he deals with other than Westenberger.  Even with the conversations monitored over TT#1 and TT#2, the full extent of the relationship between Bouren and Addison is unclear.  The monitoring of conversations over TT#3 is necessary to identify (1) all of the members of Bouren's organization; (2) the places Bouren uses in his trafficking; (3) the sources of supply for the organizations; and (4) the organization's methods of distributing drugs and collecting proceeds.  (Id., Tab 3 at 31-33.)

(B)    **Physical Surveillance.**    Between December 2012 and March 2013, investigators conducted physical surveillance of Bouren and Westenberger.    On these occasions, Bouren and Westenberger engaged in counter-surveillance behavior and on two occasions Bouren became more cautious in his activities.    Further, physical surveillance was ineffective for several trafficking transactions that occurred out of public view.    While physical surveillance can be a valuable investigative tool, it more often leads to relevant investigative information when it is used with the monitoring of wiretapped conversations.    (Id., Tab 3 at 33-35.)

(C)    **Controlled Purchases.**    The investigators engaged in controlled purchases which yielded information about Bouren being Westenberger's source of supply.    But they did not yield much other information about Bouren or his source.    Physical surveillance of Bouren in conjunction with a controlled purchase indicated that Addison had some unknown role in the drug trafficking. While future controlled purchases may yield more information about Addison, they would not indicate other items of relevant information, such as other sources, the organization's ways of laundering the drug proceeds, and others involved in the trafficking.    (Id., Tab 3 at 35-36.)

(D)  **Subject Interviews and Grand Jury Subpoenas**.  Attempts to interview target subjects and grand jury subpoenas would not yield much information about the identities of all the people involved in the trafficking and the locations where narcotics and sale proceeds are stored.  Investigators fear that attempts to interview will cause the subjects to remain silent and perhaps flee the area to avoid prosecution.  Those willing to cooperate in the investigation are not likely to have information about the full extent of the conspiracy under investigation. (Id., Tab 3 at 36-38.)

(E)    **Confidential Informants/Undercover Agents.**    The investigators have used Confidential Source #1, who provided some valuable

information.  However, CS#1 was able to purchase only small amounts of drugs from Westenberger and those only as a favor to CS#1.  Investigators would use an undercover officer but the occasion to do so safely has not yet presented itself.  However, the monitoring of conversations over TT#3 could provide information about the risks and rewards of introducing an undercover agent to Bouren.  (Id., Tab 3 at 38-39.)

(F)  **Search Warrants.**  The use of search warrants has been considered.  However, they would be inappropriate at this time, because the evidence acquired by their use would not reveal the total scope of the criminal activity under investigation and would likely compromise the investigation by alerting the target subjects to the investigation.  Further, not enough information about all the relevant locations is known.  They may be used in the future, if more information is acquired through the monitoring of conversations over TT#3.  Also, the use of subpoenas and warrants to electronic communications service providers would not allow the acquisition of the contents of communications, and not in real time. (Id., Tab 3 at 39-40.)

(G)  **Tracking Devices.**  The investigators have used a GPS tracking device on Bouren's Hummer vehicle.  While the use of this device on another vehicle would yield information about the location of the subject vehicle, it will not provide the identities of all of the members of the drug trafficking organization and such information as their roles.  (Id., Tab 3 at 40-42.)

(H)  **Trash Searches.**  The use of trash searches from target residences has been considered.  Bouren's residence area is well illuminated and there would be a high risk of detection.  If detected, whether by direct observation or indirectly by information from the usual trash hauler, the investigation would be compromised. Further, the information learned from trash searches, in the experience of the affiant, would be limited and would not indicate the leaders of the trafficking, how and when drugs are being delivered, and how drug sales proceeds are hidden.  (Id.,Tab 3 at 42.)

(I) **Mail Cover Requests.** Mail cover information from the United States Postal Service would not be helpful, because investigators do not believe Bouren's organization is using the mails to transport either drugs or the proceeds from drug sales. (Id., Tab 3 at 42-43.)

(J) **Financial Investigation.** Investigators have initiated the financial investigation of Bouren and his businesses, Elmo's Sports Bar & Grill, B & P Management, and Full Throttle Midwest. However, such financial investigations are slow and labor intensive. They are often unsuccessful, because target individuals do not place investigative information in public records such as vehicle registrations. Even when successful, financial investigations do not identify the leaders of the drug trafficking, how and when drugs are delivered, and how drug proceeds are hidden. (Id., Tab 3 at 43-44.)

(K) **Pen Register and Trap and Trace Data/Toll Records.** The investigators have obtained orders for pen registers, trap and trace devices, and toll records for TT#3. The use of these investigative techniques, while helpful to the investigators, provides only a list of telephone numbers used and not the identities of the persons who used them. (Id., Tab 3 at 44-45.)

h. The affidavit described the manner by which the wiretap monitoring would be minimized as required by statute. (Id., Tab 3 at 45-46; Id. Tab 4.)

i. Upon this affidavit, on April 4, 2013, District Judge Audrey G. Fleissig issued her order authorizing the interception of communications over cell phone number 314-606-0669, Target Telephone #3. Her order stated her findings of probable cause to believe that the target subjects were engaged in committing the stated violations of federal criminal statutes, that wire communications of the target subjects concerning these offenses would be obtained by implementation of the order, that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, and that TT#3 will continue to be

used in connection with the commission of the described offenses under investigation. The order also required the minimization of the monitored communications to those that relate to the subject investigation. (Id., Tab 2.)

j.      On April 4, 2013, Assistant United States Attorney Jeannette S. Graviss issued a letter to the investigating agents stating the agents' specific requirements for knowing the contents of the court orders authorizing the wiretapping, executing the orders as soon as practicable, recording the intercepted conversations, monitoring and minimizing procedures, protecting the recordings of conversations from alterations, duplicating the original disks of pertinent conversations, daily reporting on the investigation activities, when intercepting legally privileged communications, intercepting communications regarding other crimes, keeping an accurate log of wiretapping activities, keeping the intercepted communications confidential to those legally authorized to have access, terminating the wiretapping when the monitoring objectives have been accomplished, preparing transcripts of the conversations, and each investigating agent reviewing this letter.   (Id., Tab 4.)

k.      As required by statute and by Judge Fleissig's order, the government filed three written ten-day reports on the progress the investigation was making toward achieving its objectives and the need for continued interception.

(i)      The first reported that, among other facts, 1216 calls were intercepted, 1099 were completed, 108 were incomplete, 58 were non-pertinent, 84 were pertinent, 16 were no conversation calls, 24 had no audio, 29 were not monitored, 282 were unknown calls, 3 were malfunction calls, 268 were text message (SMS) non-pertinent calls, 52 were incomplete data voice message calls, 6 pertinent calls were minimized, and 23 calls were minimized. 2.09% of the completed calls were minimized. (Id., Tab 5.)

(ii)    The second report stated that 1208 calls were intercepted, 1092 were completed, 106 were incomplete, 70 were non-pertinent, 53 were pertinent, 12 were no conversation calls, 45 had no audio, 20 were not monitored, 89 were unknown calls, 484 were text message (SMS) non-pertinent calls, 154 were text message pertinent calls, 40 were incomplete data voice message calls, 9 pertinent calls were minimized, and 36 calls were minimized.  3.30% of the completed calls were minimized.  (Id., Tab 6.)

(iii)    The third report stated that 1353 calls were intercepted, 1243 were completed, 102 were incomplete, 79 were non-pertinent, 54 were pertinent, 4 were no conversation calls, 20 had no audio, 12 were not monitored, 16 were unknown calls, 3 were malfunction calls, 569 were text message (SMS) non-pertinent calls, 247 were text message pertinent calls, 51 were incomplete data voice message calls, 2 pertinent calls were minimized, and 36 calls were minimized.    2.49% of the completed calls were minimized.  (Id., Tab 7.)

l.    On May 6, 2013, pursuant to the application of the United States, District Judge John A. Ross ordered the sealing of the Blue Ray disk that contained the communications intercepted over the subject telephone.  (Id.. Tab 9.)


**314-814-5461 (TT#4)**
**573-664-6441 (TT#5)**
**573-705-8969 (TT#6)**

3.    a.    On May 10, 2013, the United States Attorney for this district, pursuant to 18 U.S.C. § 2518, filed an application for an order, in Case No. 4:13 MC 243, authorizing the interception of wire communications to and from the above captioned cellular telephones being used by Brent Bouren, Jerami Westenberger, Jerry Addison, Joshua Ezell, Melvin Scherrer, Jorge Lopez, Anthony Shamus, Arvil Matthews, Otto Plopper, Alan Adler, and others unknown ("target subjects").  The application sought a wiretap order for the monitoring of the telephone conversations of Bouren and the others,

named and unnamed, in the government's investigation of the subjects' trafficking in controlled substances and related offenses. More specifically, the application stated:

> In particular, these wire/and or electronic communications will concern the specifics of the above-described offenses, including (1) the nature, extent and methods of operation of the illegal drug-trafficking business of one or more of **the target subjects** and others unknown; (2) the identities and roles of principles, accomplices, aiders and abettors, coconspirators and participants in these persons' above-described illegal activities; (3) the distribution, concealment, and transfer of the contraband and money involved in those activities; (4) the existence and location of records pertaining to those activities; (5) the location and sources of resources used to finance those illegal activities; (6) the location and disposition of the proceeds from those activities; and (7) the location of items used in furtherance of those activities.

(Id., Tab 10 at 5-6.) The application stated, in part, that normal investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or were too dangerous to employ. The application was approved by a Deputy Assistant Attorney General in the Criminal Division of the Office of the Attorney General of the United States. (Id., Tab 10.)

b.     In his sworn affidavit, filed May 10, 2013, submitted in support of the application, Federal Bureau of Investigation Special Agent Christopher Johnson described his extensive training and experience in investigating the illegal trafficking in narcotics, and he set forth his expert opinions about the manner in which large-scale drug traffickers operate. He described the general types of sources of his information. He identified and described the backgrounds of the subjects of the investigation. He stated that a search of certain federal investigative surveillance indices indicated five prior wiretap applications and orders related to this investigation, as set forth below:

(1)     On March 23, 2012, this court authorized a wiretap for 314-702-0469. All interceptions on that phone number have ended. Arvil Matthews was intercepted on the phone.

(2)     On July 25, 2012, this court authorized a wiretap for 314-960-6574.  At the time of the instant affidavit, the monitoring had ended.  Targets Matthews, Bouren, and Adler have been intercepted on this wiretap.

(3)     On December 19, 2012, this court authorized a wiretap for 314-218-0979.  At the time of the instant affidavit, the monitoring had ended.  The stated target for that wiretap was Jerami Westenberger.  However, he was not intercepted on that wiretap.

(4)     On March 7, 2013, this court authorized a wiretap for 314-223-5226, used and subscribed to by Westenberger.  At the time of the instant affidavit, the monitoring had ended.  Targets Westenberger and Bouren were intercepted on this wiretap.

(5)     On April 4, 2013, this court authorized a wiretap for 314-606-0669.  At the time of the instant affidavit, the monitoring had ended.  Targets Westenberger, Bouren, Addison, Shamus, Adler, and Scherrer were intercepted on this wiretap.

      c.     The affidavit described  confidential  information received about the drug trafficking activities of Scherrer and Bouren.    Source of Information #1 (SOI#1) and Confidential Source #2 (CS#2).  For the reasons stated, Agent Johnson considers SOI#1 and CS#2 to be reliable sources.

      d.     The affidavit     stated     the wiretaps sought will enable the investigators to determine (a) how the targets and others obtain and distribute controlled substances; (b) the identities and roles of the organization members and their connections with the target subjects; (c) when and where the target offenses were committed; (d)  the operation of the drug distribution and receipt of sale proceeds of the organization; (e) the nature, scope, places and methods of the organization's operation; (f) where trafficking records are kept; and (g) where items used in furtherance of the drug trafficking activities are located.

      e.     The affidavit described facts uncovered by the investigation to date in order to demonstrate that probable cause existed for the issuance of the order.  The affidavit included facts, occurring between October 2010 and May 2013, regarding the

use of the target telephones. The affidavit specifically described many drug trafficking activities, including conversations over TT#2 for drug trafficking purposes with other targets by Jerry Addison; over TT#3 by Brent Bouren, Melvin Scherrer, Addison, and Anthony Shamus; over TT#4 by Bouren and Addison; over TT#5 by Scherrer and Bouren; and over TT#6 by Scherrer, Bouren, and Jorge Lopez. (Id., Tab 12 at 11-48.)

        f.    The affidavit described facts derived from the analysis of pen register information regarding the extensive use of TT##4, 5, and 6 by the target subjects.

        g.    The affidavit described the investigators' need for the authorization to intercept and monitor conversations over TT##4, 5, and 6. The affidavit stated that the following investigative techniques have been attempted and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ:

        (A)    **Wiretaps.** The investigators monitored conversations over a telephone used by Ray Davis. While that investigative activity yielded valuable information about Davis's methamphetamine trafficking, it did not provide sufficient information about others in the criminal activity, especially those higher up in the organization. Conversations over TT##5 and 6 would enable the investigators to identify others involved in the trafficking. Similarly, monitoring conversations over TT##1, 2, and 3 yielded useful information, including information involving the use of TT##4, 5, and 6, but not the identities of other sources of supply and other criminal activities. (Id., Tab 12 at 55-58.)

        (B)    **Controlled Purchases.** The investigators engaged in controlled purchases from Westenberger and Bouren. However, based on the circumstances of that activity, it is not likely that further controlled purchases will yield information about Addison or Scherrer. (Id., Tab 12 at 58-60.)

        (C)    **Physical Surveillance.** During 2012 and 2013, investigators conducted physical surveillance of Bouren, Westenberger, Scherrer, Addison, Lopez, and other subjects. During these surveillances, investigators observed the subjects engage in

counter-surveillance activities.  Scherrer's home is in a gated community, which increases the investigators' distance from his residence.   It appears that Scherrer has become more vigilant in order to detect the presence of law enforcement.  When used with wiretap monitoring, physical surveillance can be very effective in achieving the goals of the investigation, including identifying coconspirators, locating stash houses, and seizing drugs.  By itself, physical surveillance efforts, when suspected by the subjects, can cause the subjects to become more secretive in their criminal activity.   (Id., Tab 12 at 60-63.)

(D)  **Cooperating Sources.**  The investigators currently do not have a cooperating source who is in a position to buy drugs from Scherrer or to have contact with other high-level members of the drug trafficking organization.  Scherrer has specific people he deals with and the investigators are concerned that, if they approach one, that person will alert Scherrer.  Due to recent law enforcement activities against Scherrer, it is unlikely Scherrer will openly communicate with SOI#1, a person who previously had provided information about Scherrer.   While investigators have learned much from CS#2, they still have not learned how Scherrer transports methamphetamine to St. Louis, where he stores and packages it, and how and where he stores the proceeds of his drug sales.  CS#1 provided information about Westenberger, but is unlikely to be introduced to Addison, Scherrer, or others high in the organization.  Similarly, CS#3 is not in a position to provide information about Scherrer or Lopez.  (Id., Tab 12 at 63-66.)

(E)  **Undercover Agents.**  An undercover officer was successfully introduced to Westenberger and bought cocaine from him.   However, it is not likely Westenberger will introduce this officer to Bouren.  It is also not likely the officer will be introduced to Scherrer or Addison.   Any value in seeking the introduction of the undercover officer to these subjects can better be determined from monitoring wiretapped phone conversations over TT##4 and 5.  The use of an undercover officer in Texas caused target Lopez to question the officer whether the officer was really law

enforcement. Use of another undercover officer with Lopez is unlikely to be successful and would jeopardize the safety of the officer. (Id., Tab 12 at 66-68.)

(F) **Subject Interviews and Grand Jury Subpoenas**. Attempts to interview target subjects and the issuance of grand jury subpoenas would not yield much information about the identities of all the people involved in the drug trafficking under investigation, and the locations where narcotics and sale proceeds are stored. Lopez was interviewed in 2007 about selling cars to suspected drug traffickers. He denied knowing about any drug dealings. Scherrer was interviewed by the Missouri State Highway Police in January 2013 about a suspected murder; Scherrer refused to answer the questions. It is not likely Scherrer would answer questions about the current drug investigation. Bouren also was interviewed about the same suspected murder and refused to provide information. Investigators suspect that, if Bouren was asked about drugs, he would alert Scherrer to the investigation. (Id., Tab 12 at 68-71.)

(G) **Search Warrants.** State court search warrants were executed at target Melvin Scherrer's residence on two occasions. Some evidence regarding a murder and a small quantity of methamphetamine were seized. The use of wiretaps on the target telephones will likely yield more information about the location of drugs and drug sale proceeds. While this information may support the issuance of more search warrants for locations, such information would not necessarily provide information about the larger organization. Similar considerations attended whether or not to use search warrants for Bouren's and Addison's residences. The execution of search warrants at this time may compromise the investigation and alert the target subjects to it. Also, the investigators do not have information regarding all the locations of drug trafficking evidence and contraband. Execution of search warrants at this time of the investigation would not achieve the goals of the investigation. (Id., Tab 12 at 71-73.)

(H) **Pen Register and Trap and Trace Data/Toll Records.** The investigators have obtained orders for pen registers, trap and trace devices, toll records

for TT##1-6.  The use of these investigative techniques, while helpful to the investigators to identify other telephones used by the drug traffickers, provides only a list of telephone numbers used and not the identities of the persons who used them.  These techniques will not, by themselves, achieve the goals of the investigation.  (Id., Tab 12 at 73-74.)

(G)  **Tracking Devices, Precision Location Information, and Cell Tower Information.**   The investigators have used a GPS tracking device on Scherrer's pickup truck, Bouren's Hummer H2, and Westenberger's Dodge Charger.   The tracking aided the investigators in monitoring the movements of the vehicles.  This helped identify Bouren as Westenberger's source of supply.   The tracking of Bouren's vehicle was helpful to learn that Addison was Bouren's cocaine source and that Scherrer was Bouren's methamphetamine source.  Use of the tracking devices, however, does not indicate many other relevant facts about the drug traffickers.  All in all, tracking devices have limited usefulness, usually being used as a long-range surveillance tool.

Cell tower information and Precision Location Information provide limited information  which, when used in conjunction with wire communication monitoring, can allow investigators to learn where subjects are without the investigators being detected. This information allows investigators to be proactive in their work.  (Id., Tab 12 at 74-76.)

(H)  **Trash Searches.**   The use of trash searches from target residences has been considered.   Scherrer's residence area is in a private gated community.  He has been seen loading his trash into the  bed of his truck and driving away.   Further, the information learned from trash searches, in the experience of the affiant, would be limited and would not indicate the leaders of the trafficking, how and when drugs are being delivered, and how drug sales proceeds are hidden.  (Id., Tab 12 at 76-77.)

(I)  **Pole Cameras.**   A pole camera is being used at Scherrer's home.  This device allows the investigators to learn about Scherrer's associates who work

as Ameren UE technicians. The camera, however, was unable to photograph license plates of vehicles that went to and from this residence. The use of the pole camera can be compromised by environmental factors, such as weather. The investigators felt that installing more pole cameras would alert Scherrer and other traffickers to the investigation. Nevertheless, the investigators were able to identify Scherrer's methamphetamine source by the use of the pole camera. Currently, the pole camera in use has been malfunctioning and the investigators decided not to replace it to avoid alerting Scherrer. Finally, the investigators do not believe Scherrer would likely take part in open criminal activity near his residence, since it is in a gated community. (Id., Tab 12 at 77-78.)

(J) **Financial Investigation.** Investigators have initiated the financial investigation of Scherrer, including his expenditures. However, he conducts business with people who know him well. Asking them about him would likely result in Scherrer being alerted to the investigation. Further, such financial investigations are slow and labor intensive. Even when successful, financial investigations do not identify the leaders of the drug trafficking, how and when drugs are delivered, and how drug proceeds are hidden. (Id., Tab 12 at 78-79.)

h. The affidavit described the manner by which the wiretap monitoring would be minimized as required by statute. (Id., Tab 12 at 79-80.)

i. Upon this affidavit, on May 10, 2013, District Judge Henry E. Autrey issued his order authorizing the interception of communications over cell phone numbers 314-814-5461, 573-705-8969, and 573-664-6441, Target Telephones #4, 5, and 6, respectively. His order stated his findings of probable cause to believe that the target subjects were engaged in committing the stated violations of federal criminal statutes, that wire communications of the target subjects concerning these offenses would be obtained by implementation of the order, that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too

dangerous to employ, and that TT##4, 5, and 6 will continue to be used in connection with the commission of the described offenses under investigation. The order also required the minimization of the monitored communications to those that relate to the subject investigation. (Id., Tab 11.)

j.      On May 20, 2013, Assistant United States Attorney Jeannette S. Graviss issued a letter to the investigating agents stating the agents' specific requirements for knowing the contents of the court orders authorizing the wiretapping, executing the orders as soon as practicable, recording the intercepted conversations, knowing the monitoring and minimizing procedures, protecting the recordings of conversations from alterations, duplicating the original disks of pertinent conversations, daily reporting the investigation activities, knowing the rules regarding intercepting legally privileged communications, intercepting communications regarding other crimes, keeping an accurate log of wiretapping activities, keeping the intercepted communications confidential to those legally authorized to have access, terminating the wiretapping when the objectives have been accomplished, preparing transcripts of the conversations, and each investigating agent reviewing this letter. (Id., Tab 13.)

k.      As required by statute and by Judge Autrey's order, the government filed three written ten-day reports on the progress the investigation was making toward achieving its objectives and the need for continued interception.

(i)      The first reported that, among other facts, regarding 314-814-5461, 819 calls were intercepted, 427 were completed, 381 were incomplete, 69 were non-pertinent, 84 were pertinent, 4 were no conversation calls, 217 had no audio, 98 were not monitored, 21 were malfunction calls, 6 were text message (SMS) disabled calls, 11 calls were privileged, 4 pertinent calls were minimized, and 19calls were minimized. 4.45% of the completed calls were minimized.

The first reported that, among other facts, regarding 573-664-6441, 819 calls were intercepted, 674 were completed, 108 were incomplete, 148 were

non-pertinent, 83 were pertinent, 17 were no conversation calls, 25 had no audio, 109 were not monitored, 7 were malfunction calls, 54 were text message (SMS) non-pertinent calls, 57 were text message pertinent calls, 5 calls were privileged, 7 were incomplete text message calls, 5 pertinent calls were minimized, and 38 calls were minimized. 5.64% of the completed calls were minimized.   (Id., Tab 14.)

(ii)    The second report stated that for 314-814-5461, 544 calls were intercepted, 312 were completed,  224 were incomplete, 58 were non-pertinent, 78 were pertinent, 17 were no conversation calls, 137 had no audio, 7 calls were privileged, 16 were not monitored, 1 pertinent call was minimized, and 30 calls were minimized. 9.62% of the completed calls were minimized.

The second report stated that for 314-664-6441, 1439 calls were intercepted, 1262 were completed,  131 were incomplete, 191 were non-pertinent, 80 were pertinent, 16 were no conversation calls, 39 had no audio, 30 were malfunction calls, 14 calls were privileged, 65 were not monitored, 10 pertinent calls were minimized, and 49 calls were minimized.  3.88% of the completed calls were minimized.

The second report stated that for 573-705-8969, 61 calls were intercepted, 42 were completed, 15 were incomplete, 5 were non-pertinent, 6 were pertinent, 10 had no audio, there were no privileged calls, and 3 calls were minimized. 7.14% of the completed calls were minimized.   (Id., Tab 15.)

(iii)    The third report stated that for 314-814-5461, 696 calls were intercepted, 376 were completed,  311 were incomplete, 61 were non-pertinent, 70 were pertinent, 13 were no conversation calls, 174 had no audio, 84 were not monitored, 2 were malfunction calls, 25 calls were privileged, 3 pertinent calls were minimized, and 38 calls were minimized.  10.11% of the completed calls were minimized.

The third report stated that for 573-664-6441, 804 calls were intercepted, 715 were completed,  57 were incomplete, 135 were non-pertinent, 78 were pertinent, 5 were no conversation calls, 24 had no audio, 39 were not monitored, 2 were

malfunction calls, 159 text message calls were non-pertinent, 78 text message calls were pertinent, 6 text message calls had incomplete data, 1 call was privileged, 8 pertinent calls were minimized, and 29 calls were minimized. 4.06% of the completed calls were minimized.

The third report stated that for 573-705-8969, 1 call was intercepted, but it was not completed or monitored. (Id., Tab 16.)

l. On June 10, 2013, pursuant to the application of the United States, District Judge Jean C. Hamilton ordered the sealing of the Blue Ray disks that contained the communications intercepted over Target Telephones ## 4, 5, and 6. (Id., Tabs 17 and 18.)

## Extension of Wiretap Authorization for
## 573-664-6441 (TT#5)

4. a. July 2, 2013, the United States Attorney for this district, pursuant to 18 U.S.C. § 2518, filed an application for an order, in Case No. 4:13 MC 243, authorizing the renewed interception of wire and electronic communications to and from the above captioned cellular telephone being used by Brent Bouren, Melvin Scherrer, Jorge Lopez, Arvil Matthews, Otto Plopper, Alan Adler, Amber Scism, Howard Pyatt, Amy Horrell and others unknown ("target subjects"). The application sought a wiretap order for the monitoring of the conversations of Scherrer and the others, named and unnamed, over 573-664-6441 (TT#5), in the government's investigation of the subjects' trafficking in controlled substance and related offenses. More specifically, the application stated:

> In particular, these wire/and or electronic communications will concern the specifics of the above-described offenses, including (1) the nature, extent and methods of operation of the illegal drug-trafficking business of one or more of **the target subjects** and others unknown; (2) the identities and roles of principles, accomplices, aiders and abettors, coconspirators and participants in these persons' above-described illegal activities; (3) the distribution, concealment, and transfer of the contraband and money

involved in those activities; (4) the existence and location of records pertaining to those activities; (5) the location and sources of resources used to finance those illegal activities; (6) the location and disposition of the proceeds from those activities; and (7) the location of items used in furtherance of those activities.

(Id., Tab 19 at 4.)  The application stated, in part, that normal investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or were too dangerous to employ.  The application was approved by a Deputy Assistant Attorney General in the Criminal Division of the Office of the Attorney General.  (Id., Tab 19.)

       b.      In his sworn affidavit, filed July 2, 2013, submitted in support of the application, Federal Bureau of Investigation Special Agent Christopher Johnson described his extensive training and experience investigating the illegal trafficking in narcotics, and he set forth his expert opinions about the manner in which large-scale drug traffickers operate.  He described the general types of sources of his information.  He identified and described the backgrounds of the subjects of the investigation.  He stated that a search of certain federal investigative surveillance indices indicated eight prior wiretap applications and orders related to this investigation, including the earlier one for TT#5.

       c.      The affidavit described confidential information received about the drug trafficking activities of Scherrer and Bouren from Source of Information #1 and Confidential Source #2.  For the reasons stated, Agent Johnson considers SOI#1 and CS#2 to be reliable sources.

       d.      The affidavit stated  the wiretaps sought will enable the investigators to achieve the goals of the investigation, e.g., determining (1) the full scope of the conspiracy, including all of Melvin Scherrer's sources of supply and the identity of each of the participants who distribute drugs for him; (2)  the identities and roles of the organization members and their connections with the target subjects; (3) how Scherrer obtains narcotics, where he stores them prior to distributing them; (4) how the narcotics

are packaged for sale and which members of the organization are responsible for packaging the narcotics for further distribution; (5) how proceeds from the drug sales are collected and laundered; (6) information about Scherrer's firearms and how they are used in the drug trafficking; (7) who in the drug trafficking organization are involved in acquiring the firearms; (8) those involved in the sale of firearms to felons; (9) the existence and location of the organization's activities; (10) the circumstances of the commission of the target offenses; (11) the location of items used to further the drug trafficking; and (12) sufficient information to prosecute for the commission of the ongoing criminal activity.

   e. The affidavit described facts uncovered by the investigation to date to demonstrate that probable cause existed for the issuance of the order. The affidavit included facts, learned in the monitoring of conversations pursuant to the orders authorizing wiretaps on TT##1, 2, 3, 4, and 6, in addition to #5. The information indicated drug trafficking activities by Scherrer and other targets of the investigation as recent as June 2013.  (Id., Tab 21 at 8-27.)

   f. The affidavit also described facts derived from the analysis of pen register information which indicated extensive use of TT##4, 5, and 6 by the target subjects.

   g. The affidavit described the investigators' need for the authorization of continued interception and monitoring of conversations over TT#5. The affidavit stated that the following investigative techniques have been attempted and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ:

   (A) **Prior Wiretaps.** The affidavit described relevant, recent intercepted conversations over TT#5. The investigators monitored conversations over a telephone used by Ray Davis. While that investigative activity yielded valuable information about Davis's methamphetamine trafficking, it did not provide sufficient information about Scherrer and others in the criminal activity. Conversations over

TT##1-5, however, indicated that further monitoring of conversations over TT#5 would enable the investigators to identify others involved in the drug trafficking and with firearms  (Id., Tab 21 at 28-32.)

(B)   **Controlled Purchases.**   The investigators engaged in controlled purchases from target Scism.  However, based on the circumstances of that activity, it is not likely that further controlled purchases will yield important relevant information about Scherrer.

(C)   **Physical Surveillance.**   On May 15, 2013, the investigators surveilled Scherrer, but lost sight of him.  Nevertheless, they located target Pyatt.  They also installed a GPS device on Scherrer's motor vehicle and determined it was located in a private area they could not view directly.  On May 23, 2013, investigators saw Scherrer meet with Bouren at a QuikTrip store.  Because they monitored conversations over TT#5, they learned the criminal purpose of the meeting.  Similarly, investigators were able to observe Scherrer and Scism meet.  Again because of intercepted  telephone conversations before and after the meeting, they learned the meeting involved Scism giving Scherrer proceeds of earlier drug sales and Scherrer giving Scism more methamphetamine.  The investigators also know that Scherrer is involved with firearms and monitoring telephone conversations will inform them of future activities and safeguard law enforcement officers who are surveilling him.  Also, investigators are unable to physically view Scherrer's residence because of its location.  (Id., Tab 21 at 33-36.)

(D)   **Cooperating Sources.**   The investigators have used cooperating sources who provided historical information about members of the drug trafficking organization.  Source of Information #1 and Cooperating Source #2 have given information that led to the identification of Lopez as a source of Scherrer's drugs.  However, the cooperating sources have not assisted the investigators in achieving all the goals of the investigation set forth above.  Earlier in the investigation, CS#1 provided limited information about the drug trafficking relationship between targets Bouren and

Westenberger. Even though limited, CS#1 provided information used to support a wiretap order for TT#2. The investigators have followed information provided by CS#3 and expanded the investigation into Mexico and Texas. The use of CS#3 is limited by the limited access the source has. For CS#3 to try to expand direct contacts with others in the organization will likely arouse suspicion. CS#4 has provided information only about Scism, not about Scherrer. The affiant is not relying on CS#3's information to establish probable cause for the issuance of the instant application. Although confidential sources have provided information, that information is limited. The investigators are very strongly concerned that getting any other cooperating source to contact Scherrer will only alert Scherrer to the investigation. (Id., Tab 21 at 36-40.)

(E) **Undercover Agents.** An undercover officer was successfully introduced to Westenberger and bought cocaine from him. The officer has not been able to contact Bouren. While the undercover officer will continue to learn information about the organization, that source will not likely have the opportunity to infiltrate the organization to achieve the goals of the investigation. Further, while an undercover officer would have limited access to members of the organization, persons higher in the organizations insulate themselves from those lower. (Id., Tab 21 at 40-42.)

(F) **Subject Interviews and Grand Jury Subpoenas**. Attempts to interview target subjects and grand jury subpoenas would not yield much information about the identities of all the people involved in the trafficking, and the locations where narcotics and sale proceeds are stored. Persons officially contacted by grand jury subpoenas or otherwise will likely not provide sufficient information and may alert the other targets of the investigation. As part of this investigation, agents contacted Jorge Lopez in Texas and asked about several cars he sold to people believed to be involved with drug trafficking. While he provided information about the car sales, he provided no information about drug trafficking. Following an arrest in January 2013, Scherrer was uncooperative with officers. Similarly, Bouren provided no information when contacted

24

about the disappearance of Samuel Francis.  Bouren then alerted Scherrer to the law enforcement contacts.   When target Plopper was contacted he acknowledged that Scherrer threatened him, but provided no additional information.   The investigators believe that individuals who would cooperate with the investigation would have insufficient information to achieve all the goals of the investigation. (Id., Tab 21 at 42-45.)

(G) **Search Warrants.**   State court search warrants were executed at target Melvin Scherrer's residence on two occasions in January 2013.  Some evidence of a murder and only a small quantity of methamphetamine were seized.  Use of wiretaps on the target telephones will likely yield more information about the location of Scherrer's drugs and drug sale proceeds.   While this information may support the issuance of more search warrants for locations, such information would not necessarily provide information about the larger organization.   Execution of search warrants at this time of the investigation would not achieve the goals of the investigation.   (Id., Tab 21 at 45-47.)

(H) **Pen Register and Trap and Trace Data/Toll Records.**  The investigators have obtained orders for pen registers, trap and trace devices, and toll records for TT##1-6.   The use of these investigative techniques, while helpful to the investigators to identify other telephones used by the drug traffickers, provides only a list of telephone numbers used and not the identities of the persons who used them.  These techniques will not, by themselves, achieve the goals of the investigation. (Id., Tab 21 at 47-48.)

(I) **Tracking Devices and Cell Tower Information.**   The investigators have used GPS tracking devices on Scherrer's pickup truck and Bouren's Hummer H2.   The tracking aided the investigators in monitoring the movements of the vehicles.  This helped identify Scherrer as Bouren's source of supply.   The investigators use tracking devices in conjunction with the wiretap of TT#5.   Nevertheless, the use of

the tracking devices does not indicate many other relevant facts about the drug traffickers. All in all, tracking devices serve limited purposes, usually as long-range surveillance tools.

Cell tower information provides limited information which when used in conjunction with wire communication monitoring can allow investigators to put surveillance information into an investigative context. (Id., Tab 21 at 48-50.) )

(J) **Trash Searches.** The use of trash searches from target residences has been considered. Scherrer's residence area is in a private gated community. GPS information has demonstrated that he has driven to a trash dumpster close to his home but within the private community. Thus, his trash has been mixed with others' trash and searching it may cause citizen observers to alert Scherrer of law enforcement in the neighborhood. (Id., Tab 21 at 50-51.)

(K) **Pole Cameras.** A pole camera is being used at Scherrer's home. This device allowed the investigators to learn about Scherrer's associates who work as Ameren UE technicians. The camera, however, was unable to photograph license plates of vehicles that went to and from this residence. The use of the pole camera can be compromised by environmental factors, such as weather. The investigators felt that installing more pole cameras would alert Scherrer and other traffickers to the investigation. Nevertheless, the investigators were able to identify Scherrer's methamphetamine source by the use of the pole camera; and from the camera investigators were able to obtain information of interest to local law enforcement regarding the murder of Samuel Francis. The pole camera in use has malfunctioned from early May 2013. It was repaired on May 18, 2013. (Id., Tab 21 at 51-52.)

h. The affidavit described the manner by which the wiretap monitoring would be minimized as required by statute. (Id., Tab 21 at 52-54.)

i. Upon this affidavit, on July 2, 2013, District Judge Carol E. Jackson issued her order authorizing the renewed interception of communications over cell phone

number 573-664-6441, Target Telephone #5. Her order stated her findings of probable cause to believe that the target subjects were engaged in committing the stated violations of federal criminal statutes, that wire communications of the target subjects concerning these offenses would be obtained by implementation of the order, that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, and that TT#5 will continue to be used in connection with the commission of the described offenses under investigation. The order also required the minimization of the monitored communications to those that relate to the subject investigation. (Id., Tab 20.)

      j.    On July 5, 2013, Assistant United States Attorney Jeannette S. Graviss issued a letter to the investigating agents stating the agents' specific requirements for knowing the contents of the court orders authorizing the wiretapping, executing the orders as soon as practicable, recording the intercepted conversations, knowing the monitoring and minimizing procedures, protecting the recordings of conversations from alterations, duplicating the original disks of pertinent conversations, daily reporting on the investigation activities, intercepting legally privileged communications, intercepting communications regarding other crimes, keeping an accurate log of wiretapping activities, keeping the intercepted communications confidential to those legally authorized to have access, terminating the wiretapping when the objectives have been accomplished, preparing transcripts of the conversations, and each investigating agent reviewing this letter. (Id., Tab 22.)

      k.    As required by statute and by Judge Jackson's order, the government filed two more written ten-day reports; these were the fourth and fifth reports regarding 573-664-6441. These reports dealt with the progress the investigation toward achieving its objectives and the need for continued interception.

      (i)    The first of these two reported that, among other facts, regarding 314-664-6441, 470 calls were intercepted, 288 were completed, 38 were

incomplete, 68 were non-pertinent, 35 were pertinent, 7 were no conversation calls, 16 had no audio, 7 calls were malfunction calls, 39 were non-pertinent text message calls, 16 were pertinent text message calls, no calls were privileged, 5 calls were minimized, 1 pertinent call was minimized, and 9.62% of the completed calls were minimized.

(ii)     The second reported that 716 calls were intercepted, 617 were completed, 54 were incomplete, 139 were non-pertinent, 50 were pertinent, 5 were no conversation calls, 24 had no audio, 56 calls were not monitored, 107 text message calls were non-pertinent, 27 text message calls were pertinent, 16calls were privileged, 56 were not monitored, 5 pertinent calls were minimized, and 56 calls were minimized. 9.08% of the completed calls were minimized. (Id., Tabs 24, 25.)

l.     On July 25, 2013, pursuant to the application of the United States, District Judge Henry E. Autrey ordered the sealing of the Blue Ray disk that contained the communications intercepted over Target Telephone #5. (Id., Tabs 25 and 26.)


**(b)**

**Global Positioning System Electronic Tracking Device on 2003 White Dodge Ram**

5.     On January 28, 2013 the United States Attorney applied for and received a warrant authorizing the surreptitious attachment of a Global Positioning System (GPS) tracking device on Melvin Scherrer's specifically identified 2003 white Dodge Ram truck, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117.  In support of the application, the government submitted the written, sworn affidavit of Task Force Officer William Parks.  His affidavit established probable cause to believe that this vehicle would be used by Melvin Scherrer and others in a conspiracy to violate the federal drug laws.  The affidavit specifically identified this vehicle as used by drug trafficker Scherrer in August 2012 in drug trafficking activity.  In January 2013 a cooperating witness, who was a former girlfriend of Scherrer, told investigators that he routinely used the vehicle to transport, distribute, and conceal drugs and the proceeds

from drug sales.  During the period December 2012 to January 2013, the Ram truck was driven to Texas and back to Missouri.  CS told the investigators that, when the truck was stopped once by the Missouri Highway Patrol and searched, but no drugs were found, there actually was a moderate amount of methamphetamine hidden in a door panel.  CS told the investigators that this truck is Scherrer's primary mode of transportation.  (Id., at Tab 27; Case No. 4:13 MJ 5003.)

6.     On March 13, 2013, the government applied for and received a warrant extending the use of the surreptitious tracking device on the Ram truck.  This application was supported by the written application of the Assistant United States Attorney.   The warrant authorized the extension of the GPS device for 45 days.   (Id. at Tab 28.)

7.     On April 26, 2013, the government applied for and received a second extension of the warrant authorizing the use of the surreptitious tracking device.  This application was supported by the written application of the Assistant United States Attorney.   The warrant authorized the extension of the use of the GPS device for 45 days following the issuance of the order.   (Id. at Tab 29.)

8.     On June 7, 2013, the government applied for and received a third extension of the warrant authorizing the use of the surreptitious tracking device.  This application was supported by the written application of the Assistant United States Attorney.   The warrant authorized the extension of the use of the GPS device for 45 days following the issuance of the order.  (Id. at Tab 30.)


**(c)**

**Search of 6858 Cedar Lake Drive**

9.     a.     On July 23, 2013, upon the application of the government, a search warrant was issued by Magistrate Judge Nannette A. Baker of this district court for 6858 Cedar Lake Drive, Bonne Terre, Missouri, the residence of Melvin Scherrer.   The

application was supported by the written, sworn affidavit of F.B.I. Special Agent Christopher Johnson which informed the judge of the following.

b.     Agent Johnson described his professional law enforcement background, training, and experience.  He described his experience investigating drug trafficking by the Outlaw Motorcycle Gang and his experience investigating the drug trafficking organization of which Melvin Scherrer is a principal.  A confidential source of information used by Agent Johnson is CS.  CS has known Scherrer for a substantial period of time, has a criminal history, and is believed incorrectly by Scherrer to be still engaged in continuing criminal activity.  CS is receiving monetary compensation from the government in exchange for information.  CS has shared advice with Scherrer, and has provided federal investigators with much information that has been independently corroborated by surveillance, monitored telephone conversations, public records, the seizure of physical evidence, and information provided by other sources of information, including SOI#1.  Upon this information, Agent Johnson believes that CS is a reliable informant.

c.     The affidavit describes the information provided by CS in July 2011 about Scherrer being a multi-kilogram distributor of methamphetamine, which he obtains from Mexican sources in Texas.     The affidavit described investigative information and activity in January, August, October, November, and December 2012.

d.     On October 26, 2012, Scherrer and others loaded a stolen 1969 Camaro automobile onto a trailer at Scherrer's residence and had it transported to Texas. In December 2012 the investigators received information from (SOI#1 about Scherrer's criminal activities.  SOI#1 has known Scherrer for a substantial period of time, has a social relationship with him, and has lived in his home off and on during the months before December 2012.  SOI#1 is not receiving money from the government.  SOI#1's primary motivation for cooperating with law enforcement against Scherrer is the killing of Samuel Francis in Scherrer's home on December 17 or 18, 2012.  SOI#1 said Scherrer

was a member of the Saddle Tramps Motorcycle Gang and Francis had been representing himself to also be a member. SOI#1 has also told the investigators about the drug activities of Scherrer.

   e. The information provided by SOI#1 has been corroborated by surveillance, recorded monitored telephone conversations, controlled purchases of narcotics by an undercover officer, public information, and information provided by other sources. The information from SOI#1 has not been false, misleading, or contradicted by other evidence. The investigators believe SOI#1 is reliable.

   f. The affidavit described the investigative activities and information occurring in 2012 and 2013. In January 2013, two search warrants were executed by the Missouri Highway Patrol at Scherrer's residence and blood evidence that was seized confirmed that Samuel Francis had been present there. On January 10, 2013, investigators saw Jorge Lopez, Scherrer's source for methamphetamine, arrive at Scherrer's residence. On March 11, 2013, investigators saw Scherrer's 2003 white Dodge Ram truck on a flatbed trailer outside his home. Thereafter, investigators acquired information that the truck travelled to Texas. On April 6, 2013, investigators monitoring relevant wiretap conversations concluded that Bouren went to Scherrer's residence to pick up his methamphetamine. Drug trafficking evidence was acquired involving Scherrer in March, April, and May 2013.

   g. On May 3, 2013, Scherrer's truck left Texas around 7:00 p.m., driven by Jorge Lopez. Around 12:55 a.m. it was stopped in Arkansas by police. A narcotics trained police dog was called in, alerted to the vehicle, but officers could not find any narcotics. The vehicle was released and was driven back to Missouri. On May 4, the vehicle was stopped ultimately in a lane that led to Scherrer's house. On May 4, Bouren phoned Scherrer who said he was working on his truck, which monitoring agents believed, in the context of the information learned during the investigation, meant that Scherrer was unloading methamphetamine hidden in the truck. The agents continued to

acquire information about Scherrer's drug trafficking. On May 31, 2013, wiretap evidence was acquired that Scherrer was preparing to sell methamphetamine to other distributors and did so that evening at a pub in Bonne Terre, Missouri. Monitored phone conversations on June 2 and 3, 2013 indicated that the distribution had occurred and that payment would be forthcoming. Based on the information known, the investigators believed that when Scherrer's truck travelled to Scism's place of work, he went there to get the drug proceeds she owed him which she had placed in her vehicle.

h. In July 2013, SOI#2, who had known Scherrer for a number of years, and who had been provided methamphetamine by Scherrer on more than one occasion, told the investigators that Scherrer stores the methamphetamine on his property, although it may be buried. The investigators know that Scherrer owns a large parcel of property, with several outbuildings, and on which there are several vehicles.

i. Agent Johnson stated his opinions that, because Scherrer was involved in an ongoing, continuing drug trafficking conspiracy over a considerable period of time, that

> Scherrer might keep evidence of his crimes in his home. In my experience, and in the experience of other law enforcement officers involved in this investigation, individuals involved in drug trafficking tend to conceal the fruits and instrumentalities of their crimes at their homes. Furthermore, throughout the course of the investigation, it has become clear that Scherrer uses his home, the surrounding property, and his truck to store both narcotics and the proceeds from narcotics sales. Additionally, it is common practice for drug traffickers to store their drug inventory and drug-related paraphernalia in their residences. It is also a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences.

(Id., Tab 31, Affidavit at ¶ 84.)

j. Judge Baker's warrant authorized the search of "6858 Cedar Lake Drive, Bonne Terre, Missouri: a multi-level house with light colored siding and white

trimmed windows, unmarked, along with the adjoining yard and curtilage, as well as the outhouses and storage sheds on the property and the vehicles on the property."  A list of types of evidence to be seized from these locations was attached to the warrant.  (Id., Search and Seizure Warrant.)

k.      On July 24, 2013, the warrant was executed by federal investigators. Many items of evidentiary value, contraband, and a firearm were seized.  (Id., Search Warrant Return and 5 attached pages.)


## DISCUSSION

### GPS Evidence

Defendant Scherrer argues that the government's use of a GPS device was unconstitutional, citing United States v. Jones, 132 S.Ct. 945 (2012).   He further argues that the government did not have probable cause when it attached the device to his vehicle.    (Doc. 459.)   In Jones, the Supreme Court held that the attachment of a GPS device to a motor vehicle was subject to the warrant and probable cause requirements of the Fourth Amendment.   132 S.Ct. at 949.   The government argues that Officer Parks' affidavit included sufficient information to establish probable cause for the issuance of the warrant.

The standard for reviewing the propriety of the issuance of a warrant under the Fourth Amendment is clear.  The issuing judge's determination of probable cause should be accorded "great deference" by the reviewing court.  United States v. Oropesa, 316 F.3d 762, 766 (8th Cir. 2003); Unites States v. Sundby, 186 F.3d 873, 875 (8th Cir. 1999).  In this exercise of judicial review, this reviewing court considers not whether the affidavit established probable cause, but whether it provided the issuing judge a substantial basis for finding probable cause.   United States v. Leon, 468 U.S. 897 (1984). In this regard, this court may consider the information provided by an informant as to its reliability, veracity, and basis of knowledge. United States v. Robertson, 39 F.3d 891,

893 (8th Cir. 1994); see also Illinois v. Gates, 462 U.S. at 237-39 (reaffirming the totality-of-the-circumstances analysis).

Task Force Officer Parks' affidavit submitted on January 28, 2013, for the GPS warrant not only provided the issuing judge a substantial basis for finding probable cause, but clearly established probable cause. It presented sufficient information for the judge reasonably to believe that the use of the device will disclose evidence of criminal activity by Melvin Scherrer in connection with the vehicle. The affidavit specifically identified this vehicle as used by Scherrer in August 2012 in drug trafficking activity. While the vehicle was stopped in Missouri en route to Bonne Terre, and officers then did not find the narcotics hidden in it, a drug trained dog alerted to the vehicle and later a confidential source told the investigators that there had been methamphetamine in the vehicle that was not found. Further, in January 2013 a cooperating witness, who was a close associate of Scherrer, said Scherrer routinely used the vehicle to transport, distribute, and conceal drugs and the proceeds from drug sales. (Id., at Tab 27, Affidavit, ¶¶ 5 and 6; Case No. 4:13 MJ 5003.)

Even if the court were to conclude that Officer Parks' affidavit did not provide Judge Baker a substantial basis for finding probable cause, the undersigned concludes that the circumstances establish a good faith exception to the exclusionary rule under United States v. Leon, 468 U.S. 897 (1984). There is nothing in the record that establishes that the supporting affidavit included false information; that Judge Baker abandoned her role as a judge in determining whether to issue the warrant; that the affidavit lacked a basis for finding probable cause; or that the warrant which was issued was facially deficient. United States v. Cannon, 702 F.3d 407, 412 (8th Cir. 2013).

The motion to suppress evidence derived from the use of this GPS device on Melvin Scherrer's Ram truck should be denied.

Wiretap Evidence

Defendant Scherrer has moved to suppress the evidence derived from the operation of wiretapping equipment to monitor and record oral wire communications. Specifically, he argues that (1) the initial affidavits that supported the applications for the wiretap orders were not legally sufficient to support the issuing judges' findings that "normal investigative procedures [had] been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," as required by 18 U.S.C. § 2518(3)(c); and (2) the government failed to conduct the phone call monitoring so to minimize or limit the monitoring to those communications that were relevant to the investigation, as required by 18 U.S.C. § 2518(5) and the orders authorizing the wiretaps. (Doc. 459, at 5-6.)

A federal judge may issue an order authorizing the interception of wire or oral communications, upon a proper application of the United States. 18 U.S.C. § 2516(1). Relevant to defendant's arguments, the judge must find that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous if tried; and the judge must order that the government minimize the monitoring to those communications that are relevant to the investigation. 18 U.S.C. § 2518(3), (5).

(1) Necessity for the Wiretaps

The Court of Appeals for the Eighth Circuit recently discussed the relevant issues regarding whether the wiretaps were necessary as required by § 2518(3):

> "The necessity requirement of § 2518 insures 'that wiretaps are not routinely employed as the initial step in an investigation.'" United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003), quoting United States v. Thompson, 210 F.3d 855, 859 (8th Cir. 2000). However, "[i]f law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." [United States v. West, 589 F.3d 936, 939 (8th Cir. 2009)], quoting Jackson, 345 F.3d at 644.

<u>United States v. Milliner</u>, No. 14-1129, 2014 WL 4211367 at *2 (8th Cir., Aug. 27, 2014).

In this case, the affidavits provided the issuing judges with sufficient bases for finding that the wiretaps were necessary.   The affidavits, based upon the expert training and experience of the investigating agents and officers, established that the wiretaps were needed because normal investigative techniques by themselves would not have been as successful or, if used would have been unnecessarily dangerous.   In making these conclusions, the court may lawfully credit the expert opinions of the law enforcement affiants.  <u>United States v. Davis</u>, 882 F.2d 1334, 1344 (8th Cir. 1989).

Three orders, with separate supporting applications and affidavits, authorized wiretaps that generated evidence which defendant Scherrer seeks to have suppressed:  (1) order for TT#3 on April 4, 2013 (Finding 2); (2) order for TT##4, 5, and 6 on May 10, 2013 (Finding 3); and  (3)  order extending TT#5 (Finding 4).

Each of the applications described the general goals of the investigation and of the wiretap in similar language:

> In particular, these wire communications will concern the specifics of the above-described offenses, including (1) the nature, extent and methods of operation of the illegal drug-trafficking business of one or more of **the target subjects** and others unknown; (2) the identities and roles of principles, accomplices, aiders and abettors, coconspirators and participants in these persons' above-described illegal activities; (3) the distribution, concealment, and transfer of the contraband and money involved in those activities; (4) the existence and location of records pertaining to those activities; (5) the location and sources of resources used to finance those illegal activities; (6) the location and disposition of the proceeds from those activities; and (7) the location of items used in furtherance of those activities.

(Finding 2a, 3a, and 4a.)

The affidavit for TT#3 stated that the specific goals for that wiretap were to learn (a) how Jerami Westenberger's drug trafficking organization obtains and distributes its

drugs; (b) who the organization members are and what each does; (c) when and where their criminal activity occurs; (d) the procedures they follow to distribute the drugs and deal with the sale proceeds; (e) more generally, the nature, scope, places and methods of the organization's operation; and (f) where the drug trafficking records are kept. (Finding 2d.) The specific goals for the wiretaps of TT##4, 5, and 6 were stated in the affidavit as similar to those of TT#3 but focusing on Boren and Scherrer. (Findings 3c and d.)

The specific goals for the investigation and the extension of the wiretap for TT#5 show the changes in the investigation as it matured and concentrated on defendant Scherrer:

> The affidavit stated the wiretaps sought will enable the investigators to achieve the goals of the investigation, e.g., determining (1) the full scope of the conspiracy, including all of Melvin Scherrer's sources of supply and the identity of each of the participants who distribute drugs for him; (2) the identities and roles of the organization members and their connections with the target subjects; (3) how Scherrer obtains narcotics, where he stores them prior to distributing them; (4) how the narcotics are packaged for sale and which members of the organization are responsible for packaging the narcotics for further distribution; (5) how proceeds from the drug sales are collected and laundered; (6) information about Scherrer's firearms and how they are used in the drug trafficking; (7) who in the drug trafficking organization are involved in acquiring the firearms; (8) those involved in the sale of firearms to felons; (9) the existence and location of the organization's activities; (10) the circumstances of the commission of the target offenses; (11) the location of items used to further the drug trafficking; and (12) sufficient information to prosecute for the commission of the ongoing criminal activity.

(Finding 4d.)

To accomplish these goals, prior to seeking the wiretap authorization for TT#3, the investigators had acquired information from Confidential Source #1 from conversations with Jerami Westenberger, toll records and information regarding a source of supply Westenberger discontinued, monitored phone calls over two earlier target telephones, purchases of cocaine from Westenberger by an undercover officer, physical

surveillance of Brent Bouren and of Westenberger's residence, and recorded conversations during drug transactions.  (Finding 2e.)

Similarly, prior to seeking authorization to wiretap TT##4, 5, and 6, the investigators had used  information acquired from previous wiretaps, information from two reliable cooperating informants, the actual use of controlled purchases, physical surveillance, an undercover agent, the interviews by police of Scherrer and Bouren, the execution of search warrants on Scherrer's residence in the investigation of a killing, pen register/trap and trace and toll records, tracking devices on Scherrer's, Bouren's, and Westenberger's vehicles, a pole camera, and financial investigation.  (Findings 3c-g.)

Finally, prior to seeking the extension of the wiretap of TT#5, the investigators described the sources of information and evidence previously used:  prior wiretaps, controlled purchases, physical surveillance of Scherrer, cooperating individuals,  an undercover agent who bought cocaine from Westenberger, the earlier interviews of Scherrer, Bouren, and Lopez in Texas, the two search warrants for Scherrer's home, toll records and pen register/trap and trace devices, a pole camera, tracking devices, and cell tower information; trash searches were considered but not used because they would not be successful.   (Finding 4c-g.)

It is clear that the wiretaps at issue on defendant Scherrer's motion to suppress were not used as **initial** investigative techniques, but only after other techniques were used.

Defendant Scherrer argues that sources of information provided the investigators with sufficient information and the unused procedures were summarily rejected and were not too dangerous to be tried.  (Doc. 459 at 3-4.)  The undersigned disagrees.  The stated overall goals of this investigation clearly indicate the long lasting, highly developed, and extensive characteristics of the subject drug trafficking conspiracy under investigation. The stated goals for the specific wiretaps indicate the investigators engaged in reasonable and tailored considerations of why the wiretap authorizations were necessary.

The record recounted above shows beyond cavil that all of the many described investigative techniques were either used with some, but not sufficient and certainly not complete, success, or were considered and determined to be unsuited for acquiring the information reasonably considered necessary for a lawful prosecution of the target individuals. The investigators knew from this investigation and from their general experience and training that using trash searches, grand jury subpoenas, premature interrogations, and premature search warrant executions would most likely alert the target individuals to the investigation, thereby making the acquisition of evidence and information much less likely if not impossible. Milliner, 2014 WL 4211367 at *2.

This argument for suppression of the wiretap evidence is without merit.


(2) Minimization

Scherrer also argues that the investigating agents failed to minimize the wiretap monitoring as required by the authorizing orders and the statute. When speaking about the standards applicable to the minimization requirement of the wiretap statute, the Supreme Court has considered that the proper approach for reviewing the lawfulness of wiretap minimization involves applying "a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved," without requiring a showing of good faith effort at minimization on the part of the investigators. Scott v. United States, 436 U.S. 128, 138-39 (1978).

The Supreme Court, in applying this objective standard, considered that the percentage of nonpertinent calls monitored, while relevant, "is not a sure guide to the correct answer." Id. at 140. Rather, even where the percentage of nonpertinent monitored calls is high, their interception may still be reasonable because they were of short duration, appeared to be ambiguous in content, or appeared to use code. Id. A review of relevant conversations that were quoted in affidavits shows that the target

individuals often used code to communicate with one another.  (e.g., Tab 3 at 12, 14-15, 20.)

The Supreme Court has also stated,

In determining whether the agents properly minimized, it is also important to consider the circumstances of the wiretap.  For example, when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.

Scott v. United States, 436 U.S. at 140.   The case at bar involved a very widespread conspiracy, many targets, sources in Mexico and Texas, and much activity.   This indicated the need to extend the monitoring into conversations that under other circumstances might have been minimized, especially at the beginning of the subject wiretaps.

Further, the percentages of completed calls that were minimized increased substantially over time and were substantial:   2.09% (Finding 2k(i)), 3.30% Finding 2k(ii), 2.49% (Finding 2k(iii)), 4.45% (Finding 3k(i)), 5.64% (id.), 9.62% (Finding 3k(ii)), 3.88% (id.), 7.14% (id.), 10.11% (Finding 3k(iii)), 4.06% (id.), 9.62% (Finding 4k(i)), and 9.08% (Finding 4k(ii)).

It is clear from the evidence that minimization was an important obligation imposed on the investigators.  The monitoring agents were schooled in their duty to minimize.  And the results of minimization efforts were reported to the court.

Finally, defendant has pointed to no prejudice to him from any failure of the agents to minimize one or more conversations that should have been minimized.

For these reasons, the motion to suppress wiretap evidence should be denied.

### III

### Search of Residence

Defendant Scherrer argues that the search of his residence was unlawful under the Fourth Amendment. (Doc. 457.) The only evidence offered at the hearing on this motion dealt with whether the warrant was lawfully issued

The issue before this court when reviewing the validity of the issuance of a search warrant, as stated above, is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant. United States v. Stevens, 439 F.3d 983, 987 (8th Cir. 2006) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)). Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit. United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. at 238).

The search warrant for 6858 Cedar Lake Drive was issued on July 23, 2013 and was executed the next day. Agent Johnson's sworn, written affidavit, the sole basis for the issuing judge's finding of probable cause, described information that dated from July 2011 to July 2013. The affidavit described sufficient facts to establish that Melvin Scherrer, the owner of 6858 Cedar Lake Drive, had been a multi-kilogram trafficker in methamphetamine since July 2011. (Finding Nos. 9c, above.)

The affidavit stated that in December 2012, a reliable[2] informant, who had lived with Scherrer in 6858 Cedar Lake Drive, told the investigators about the killing of Samuel Francis at 6858 Cedar Lake Drive in December 2012. (Finding No. 9d, above.) The affidavit described Scherrer's drug trafficking activities in 2012 and 2013. In January 2013, 6 months before the issuance of the search warrant, the Missouri Highway Patrol seized a small amount of methamphetamine from 6858 Cedar Lake Drive in the execution of two search warrants for evidence for the Francis killing. In April, 2013, after Scherrer's vehicle was taken to Texas and returned to 6858 Cedar Lake Drive, co-

---

[2] See Finding No. 9e, above.

conspirator Bouren traveled to 6858 Cedar Lake Drive to obtain his methamphetamine. In March, April, and May 2013, Scherrer trafficked in methamphetamine. (Finding No. 9f, above.)

The affidavit stated that in May 2013, Scherrer's truck was being driven from Texas, when it was stopped in Arkansas. A narcotics trained police dog alerted to the vehicle, but police could find no drugs. During the rest of May and in June 2013, Scherrer prepared to and did distribute drugs and used his truck to collect drug proceeds owed to him. (Finding No. 9g, above.) In July 2013, SOI#3, who knew Scherrer for years, told the investigators that Scherrer stored his methamphetamine on his property, maybe buried, at 6858 Cedar Lake Drive. (Finding No. 9h, above.)

The affidavit stated Agent Johnson's expert drug investigator opinions, based on his training and experience, that drug traffickers tend to conceal evidence of their drug trafficking in their residences, and that Melvin Scherrer "uses his home, the surrounding property, and his truck to store both narcotics and the proceeds from narcotics sales." (Finding No. 9i, above.)

The undersigned finds that Agent Johnson's affidavit provided the issuing judge a substantial basis for finding probable cause to issue the search warrant for 6858 Cedar Lake Drive. The motion to suppress the evidence seized from that location should be denied.

## IV.

## CONCLUSIONS

For these reasons,

**IT IS HEREBY ORDERED** that the motion of the United States for a determination by the court of the admissibility or not of arguably suppressible evidence (Doc. 136 oral) is denied as moot.

**IT IS HEREBY RECOMMENDED** that the motion of defendant Melvin Scherrer to suppress statements (Doc. 458) be denied as moot.

**IT IS FURTHER RECOMMENDED** that the motions of defendant Melvin Scherrer to suppress evidence generally (Doc. 137 oral) and to suppress evidence seized from his residence (Doc. 457) be denied.

**IT IS FURTHER RECOMMENDED** that the motion of defendant Melvin Scherrer to suppress evidence obtained from the use of a global positioning system device and from Title III wiretaps (Doc. 459) be denied.

The parties are advised they have 14 days from the issuance of this Order and Recommendation to file written objections thereto.  The failure to file timely written objections may waive the right to appeal issues of fact.


_____    /S/   David D. Noce_____
                **UNITED STATES MAGISTRATE JUDGE**

Signed on October 8, 2014.